**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| AMERICAN CIVIL CONSTRUCTION, LLC, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 15-0515 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 20, 21, 27, 29 |
| | : | | |
| FORT MYER CONSTRUCTION | : | | |
| CORPORATION, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
GRANTING DEFENDANT'S MOTION TO DISMISS; DENYING PLAINTIFF'S CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT; DENYING DEFENDANT'S MOTION TO STRIKE AS MOOT

## I. INTRODUCTION

This action arises from a dispute between two construction companies.  Plaintiff
American Civil Construction, LLC ("ACC") alleges that Defendant Fort Myer Construction
Corporation ("Fort Myer") breached a subcontract for work related to the District of Columbia's
new streetcar system.  After a period of discovery, Fort Myer filed a motion to dismiss for lack
of subject matter jurisdiction and a motion for summary judgment.  In response, ACC cross-
moved for partial summary judgment on two discrete issues.  Because the Court finds that ACC
brought suit despite failing to acquire the proper registration with the District, the District's door
closing statute deprives the Court of subject matter jurisdiction.  But the Court will permit ACC
an opportunity to file a supplemental complaint within thirty days to attempt to cure the
jurisdictional problem.  Finally, the Court finds that genuine issues of material fact preclude
granting summary judgment to either party.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The Court will begin with a description of the allegations found in ACC's Complaint before turning to other relevant facts and the procedural history of this action.

### A. Allegations of the Complaint[1]

According to the Complaint, American Civil Construction, LLC, is a limited liability company organized under the laws of Maryland, with its principal place of business in Maryland. Compl. ¶ 1, ECF No. 1.  ACC is in the business of construction contracting.  Compl. ¶ 1.  Fort Myer Construction Corporation is a corporation organized under the laws of Virginia, with its principal place of business in the District of Columbia.  Compl. ¶ 2.  Fort Myer is also in the business of construction contracting, and regularly does business in the District.  Compl. ¶ 2.

ACC's allegations are related to the construction of a streetcar project in the District. Compl. ¶ 4.  Specifically, Fort Myer entered into a contract with the D.C. Department of Transportation ("DDOT") referred to as the "Construction of Anacostia Initial Line Segment and Operation and Maintenance Facility, and Reconstruction of Firth Sterling Avenue – Milestone B" ("Anacostia Project").  Compl. ¶ 5.  Fort Myer, the prime contractor, entered into a subcontract with ACC for the construction of foundations and the installation of ground rods and conduits.  Compl. ¶ 6.  Originally, the value of the work described in the subcontract was $649,161, but change orders increased that figure to $1,052,878.17.  Compl. ¶ 6.

In a letter dated October 26, 2012, Fort Myer stated that it was terminating the subcontract with ACC "for convenience," even though the subcontract work was not yet completed.  Compl. ¶ 8.  ACC alleges that the terms of the subcontract only allow for

---

[1] When considering a motion to dismiss for lack of subject matter jurisdiction, a court "accepts the allegations of the complaint as true."  *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

termination "for convenience," if DDOT also terminated its prime contract with Fort Myer "for convenience" first.  Compl. ¶ 9.  ACC alleges, however, that the prime contract between DDOT and Fort Myer was not terminated.  Compl. ¶ 10.

ACC alleges that it wrote to Fort Myer and stated that the termination of the subcontract was wrongful and that ACC was prepared to complete the work described in the subcontract. Compl. ¶ 11.  Fort Myer refused that offer, which ACC alleges was a breach of the subcontract. Compl. ¶ 12.  ACC alleges that it was entitled to overhead and profit on the work it performed under the subcontract, but that Fort Myer has not made those payments.  Compl. ¶¶ 9, 13.

ACC alleges that, before the termination of the subcontract, it performed work that was outside of the scope of the subcontract.  Compl. ¶ 14.  All of that work was "performed at the direction and with the knowledge and agreement of" Fort Myer.  Compl. ¶ 14.  Fort Myer had a duty to process change orders related to that work, but Fort Myer refused to process and pay the change order requests that ACC submitted.  Compl. ¶ 15.  ACC alleges that this refusal constituted an additional breach of the subcontract.  Compl. ¶ 15.

Finally, ACC alleges that retainage was withheld from Fort Myer's payments to ACC. Compl. ¶ 16.  ACC alleges that the full amount of the withheld retainage has not been paid to ACC.  Compl. ¶ 17.  In light of all of these allegations, ACC concludes that it has performed all work available to it under the subcontract, and that Fort Myer's breach has caused damages. Compl. ¶¶ 18–19.  ACC thus requests $300,000 in damages, as well as interest and costs. Compl. at 4.

## B.  Facts in the Record

The parties have presented a range of evidence in connection to the motions for summary judgment, including relevant documents and various declarations.  ACC provides a letter dated

May 28, 2009, from Fort Myer to ACC's then-Principal, Edward F. Hollander, that encloses a

copy of the subcontract at issue in this case.  *See* Pl.'s Resp. Def.'s Mot. Summ. J. & Cross-Mot.

Partial Summ. J. ("Pl.'s Opp'n & Cross-Mot. Summ. J."), Ex. 4 at 1, ECF No. 24-4.[2]  The

portions of the subcontract included in the record make clear that the subcontract related to a

prime contract between Fort Myer and DDOT for work on the Anacostia Project.  *See* Pl.'s

Opp'n & Cross-Mot. Summ. J., Ex. 4 at 2.  An addendum to the standard form agreement states

that "[t]he Contractor may at any time terminate Subcontractor upon reasonable notice, for

Contractor's convenience."  Pl.'s Opp'n & Cross-Mot. Summ. J., Ex. 4 at 4–5, ¶ 7.3.  But an

attachment listing modifications to the terms of the addendum states that paragraph 7.3 of the

addendum is struck, deleted, and replaced with: "The Contractor can only terminate the

Subcontractor for convenience if the Owner similarly terminates the Contractor."  Pl.'s Opp'n &

Cross-Mot. Summ. J., Ex. 4 at 7, ¶ 7.3.

On October 12, 2010, DDOT sent a letter to Fort Myer that set forth a significant change

to the scope of the prime contract.  Def.'s Opp'n Cross-Mot. Partial Summ. J., Ex. A at 1, ECF

No. 28.  The letter stated that "[t]he remaining scope of work on this Contract is limited to the

work identified in this Article 3 Letter, and the Contractor shall not perform any other work,

unless it receives written authorization."  Def.'s Opp'n Cross-Mot. Partial Summ. J., Ex. A at 1.

In turn, Fort Myer sent a letter to its subcontractor, ACC, dated October 26, 2010.  Pl.'s

Opp'n & Cross-Mot. Summ. J., Ex. 2 at 1, ECF No. 24-2.  Fort Myer stated that DDOT had

_____

[2] ACC has not used any specific numbers or letters to identify the exhibits attached to its opposition to Fort Myer's motion for summary judgment and cross-motion for partial summary judgment.  *See generally* Pl.'s Resp. Def.'s Mot. Summ. J. & Cross-Mot. Partial Summ. J. ("Pl.'s Opp'n & Cross-Mot. Summ. J."), ECF No. 24.  For clarity, the Court's citations to these exhibits will refer to the document numbers and page numbers created by the Court's Electronic Case Filing system.

"suspended" the prime contract through its October 12 letter and "deleted portions of its scope." Pl.'s Opp'n & Cross-Mot. Summ. J., Ex. 2 at 1.  Fort Myer explained that DDOT had since directed Fort Myer to resume work on the Anacostia Project, but that, in light of the changed scope of the contract, Fort Myer would terminate its subcontract with ACC "for convenience." Pl.'s Opp'n & Cross-Mot. Summ. J., Ex. 2 at 1.  ACC responded by letter dated November 7, 2012.  *See* Def.'s Statement of Undisputed Facts, Ex. A at 1, ECF No. 20.  ACC's letter was drafted by Michael J. Jack, outside counsel who represents ACC in this litigation.  Def.'s Statement of Undisputed Facts, Ex. A at 1.  The letter noted that when Mr. Hollander contacted Kathi Muttart, a Fort Myer employee, she advised that all communications should be directed to Christopher M. Kerns, the Vice President and General Counsel for Fort Myer.  Def.'s Statement of Undisputed Facts, Ex. A at 1.  The letter also argued that the subcontract did "not give [Fort Myer] the right to terminate for convenience, except where [Fort Myer] has been terminated by the owner."  Def.'s Statement of Undisputed Facts, Ex. A at 1.  The parties exchanged additional letters through their counsel.  *See, e.g.*, Def.'s Opp'n Cross-Mot. Partial Summ. J., Ex. C at 1 (letter from Fort Myer's Associate General Counsel to Mr. Jack dated November 9, 2012); Pl.'s Opp'n & Cross-Mot. Summ. J., Ex. 2 at 4–5 (letter from Mr. Jack to Fort Myer's Associate General Counsel dated November 30, 2012).

On November 20, 2014, ACC and Fort Myer executed a two-page document titled "Subcontractor's Affidavit and Final Waiver of Lien."  Decl. of Thomas Mero, Ex. A ("Final Waiver of Lien") at 1, ECF No. 20.  The document referred to the contract between Fort Myer and ACC for work on the Otis Street Project.[3]  Final Waiver of Lien at 1.  The release did not

---

[3] Specifically, the contract refers to "the project known as the Pavement Restoration (City-Wide) Streetscape of 12th Street, N.E. from Rhode Island Avenue to Michigan Avenue and

specifically mention the Anacostia Project.  *See generally* Final Waiver of Lien.  The release

called for Fort Myer to pay ACC $10,000.  Final Waiver of Lien at 1.  In consideration for the

payment, ACC promised to:

> Release and forever discharge Fort Myer of and from all debts, claims, demands, liabilities and causes of action of every character whatsoever arising out of or in connection with subcontract or any other work performed by subcontractor on any project except as follows: (there are no exceptions unless specific claims in stated amounts are listed):

Final Waiver of Lien at 2.  Following that paragraph, handwritten notes purportedly written by

Edward Hollander, the late owner of ACC, list "AS-BUILTS PURCHASE ORDER $4,000 –

(LESS APPROX $3,600 +/- OWED BY ACC ON ANOTHER PROJECT) FOR NET OF

ABOUT $400 +/- (SEPARATE MATTER)."  Final Waiver of Lien at 2.

Pursuant to the release, Fort Myer made payments of $10,000 and $4,000 to ACC in

November 2014.  Decl. of Thomas Mero ¶ 11.  ACC made a payment of $3,600 to Fort Myer

around the same time.  Decl. of Jennifer Lawson ¶ 8, ECF No. 20.  Evidence provided by the

parties suggests that both ACC and Fort Myer accepted compromise payments when they agreed

to the release.  A representative for ACC states that, "[a]s of November, 2014, the amount which

ACC considered outstanding and claimed on the Otis Street Project was $22,000.00."  2d Decl.

of Irene Stephen ¶ 4, ECF No. 24-1.  A representative for Fort Myer states that, "[i]n or around

November, 2014, [ACC] owed Fort Myer . . . the amount of $4,348.10 relating to various

project[s], but not related to [the Otis Street Project]."  Decl. of Jennifer Lawson ¶ 8.

---

Otis Street, N.E. Washington, D.C., DC Contract No. SCKA-2009-C-0025."  Final Waiver of
Lien at 1.

The parties agree that Mr. Hollander died sometime after the release was executed.  *See*
Pl.'s Opp'n & Cross-Mot. Summ. J. at 5; Def.'s Reply Supp. Mot. Summ. J., at 1 n.2, ECF No.
26.

### C.  Proceedings in this Court

ACC brought suit in this Court on April 8, 2015.  *See generally* Compl.  After Fort Myer
answered the Complaint, the Court entered a scheduling order to govern discovery in this case on
June 18, 2015.  *See generally* Scheduling Order, ECF No. 8.  The parties engaged in mediation,
but those efforts were fruitless.  *See* Order Referring Case to Magistrate Judge for Mediation,
ECF No. 10.  Upon the parties' request, the Court entered a schedule for dispositive motions,
with any dispositive motions to be filed on or before August 1, 2016 and any oppositions to be
filed on or before August 30, 2016.  *See* Min. Order (June 14, 2016).

On August 1, 2016, Fort Myer separately filed a motion to dismiss and a motion for
summary judgment.  *See generally* Def.'s Mot. Summ. J., ECF No. 20; Def.'s Mot. Dismiss for
Lack of Subject Matter Jurisdiction ("Def.'s Mot. Dismiss"), ECF No. 21; *see also* Def.'s Mem.
P. & A. Supp. Mot. Dismiss ("Def.'s Mem. Supp. Mot. Dismiss"), ECF No. 22; Def.'s Mem. P.
& A. Supp. Mot. Summ. J. ("Def.'s Mem. Supp. Mot. Summ. J."), ECF No. 20.  In its response
to the motion for summary judgment, ACC included a cross-motion for partial summary
judgment.  *See generally* Pl.'s Opp'n & Cross-Mot. Summ. J.[4]  Fort Myer filed a motion to strike
the cross-motion, arguing that the cross-motion was filed after the Court's deadline for

---

[4] For the purposes of clarity, the Court notes that ACC's filing was originally docketed at
ECF No. 24 only as a response to Fort Myer's motion for summary judgment.  The filing was
subsequently docketed at ECF No. 29 as a cross-motion for summary judgment as well.

dispositive motions.  *See generally* Def.'s Mot. Strike Pl.'s Cross-Mot. Partial Summ. J. ("Def.'s

Mot. Strike"), ECF No. 27.  The Court now turns to those pending motions.[5]

## III.  DISCUSSION

The Court begins its analysis with Fort Myer's motion to dismiss for lack of subject

matter jurisdiction.  For the reasons set forth below, the Court will grant the motion to dismiss,

but permit ACC an opportunity to file a supplemental complaint to cure any jurisdictional defect.

The Court next considers Fort Myer's and ACC's motions for summary judgment in turn.  The

Court finds that genuine questions of material fact preclude granting summary judgment to either

party.

### A.  Subject Matter Jurisdiction

The Court first turns to Fort Myer's motion to dismiss.  The motion to dismiss argues that

this Court lacks subject matter jurisdiction because ACC failed to obtain a certificate of

registration from the District of Columbia.  Although the Court finds that it lacks subject matter

jurisdiction, ACC will have an opportunity to cure the jurisdictional defect with an appropriate

supplemental pleading.

#### 1.  Legal Standard

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of an action for lack

of subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  Federal courts are courts of limited

jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction."  *Rasul v.*

*Bush*, 542 U.S. 466, 489 (2004) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S.

---

[5] After the close of briefing on the pending motions, Fort Myer filed a motion to compel that sought an order requiring ACC to make a corporate designee available for a deposition and to produce certain documents.  *See generally* Def.'s Mot. Compel, ECF No. 30.  The Court noted the lack of any opposition and granted the motion to compel.  *See* Min. Order (Nov. 14, 2016).

375, 377 (1994)); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a

court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").  It is

the plaintiff's burden to establish that the court has subject matter jurisdiction.  *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  To determine whether jurisdiction exists, a

court may "consider the complaint supplemented by undisputed facts evidenced in the record, or

the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."

*Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting

*Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

2.   Analysis

Fort Myer's motion to dismiss turns on the District of Columbia's "door closing" statute,

which prohibits a foreign corporation from maintaining any action in the District unless it has

obtained a certificate of registration from the District's Department of Consumer and Regulatory

Affairs ("DCRA").  *See* Def.'s Mem. Supp. Mot. Dismiss at 2.  Fort Myer asserts that ACC

failed to register with the DCRA and argues that the failure to register is a jurisdictional bar to

this suit.  *See* Def.'s Mem. Supp. Mot. Dismiss at 2.  ACC makes two arguments in response.

First, ACC contends that the door closing statute only applies to entities that are doing business

in the District at the time they bring suit.  *See* Pl.'s Resp. Mot. Dismiss at 2, ECF No. 23.

Second, ACC notes that it subsequently obtained a certificate from DCRA and requests leave to

file a supplemental pleading to cure any jurisdictional issue.  *See* Pl.'s Resp. Mot. Dismiss at 2.

a.   *The Door Closing Statute*

The District's door closing statute provides that "[a] foreign filing entity or foreign

limited liability partnership doing business in the District may not maintain an action or

proceeding in the District unless it is registered to do business in the District."  D.C. Code

§ 29-105.02(b).[6]  Both parties acknowledge that this Court previously addressed the District's

door closing statute in *Landmark Health Solutions, LLC v. Not For Profit Hospital Corporation*,

950 F. Supp. 2d 130 (D.D.C. 2013).  *See* Def.'s Mem. Supp. Mot. Dismiss at 2; Pl.'s Resp. Mot.

Dismiss at 2.  In *Landmark Health*, this Court noted "that a federal court sitting in diversity, such

as this one, 'must apply the District's door closing statute.'"  950 F. Supp. 2d at 134 (quoting

*Tel. & Data Sys., Inc. v. Am. Cellular Network Corp.*, 966 F.2d 696, 699 (D.C. Cir. 1992) (per

curiam)).

Interpreting the door closing statute, the District of Columbia Court of Appeals has stated

that the failure to obtain a certificate is not "absolutely prohibitive," but instead "merely

suspend[s] the power to continue with the suit until the corporation complie[s] with the laws of

the District."  *York & York Const. Co. v. Alexander*, 296 A.2d 710, 714 (D.C. 1972) (citing *Hill-

Lanham, Inc. v. Lightview Dev. Corp.*, 163 F. Supp. 475 (D.D.C. 1957)).  The court concluded

that "non-compliance is a mere temporary disability" that is "capable of obviation at any [stage]

of the proceedings."  *York*, 296 A.2d at 714 (quoting *Hill-Lanham*, 163 F. Supp. at 476).  That

conclusion was based on the fact that the statute is not intended to "deprive a[n unregistered]

corporation of access to the courts, but only to force the corporations to pay whatever fees, taxes,

or other financial obligations are owing to the body politic."  *York*, 296 A.2d at 714; *see

also Fed. Loose Leaf Corp. v. Woodhouse Stationery Co.*, 163 F. Supp. 482, 483 (D.D.C.

1958) (finding that the purpose of a statute like this is not to provide "a weapon of substantial

defense" for the opposing party, but rather to bring foreign entities under the control of state

officials).

---

[6] This statute previously appeared in a different section of the D.C. Code.  *See* D.C. Code § 29A–101.119, *repealed by* D.C. Legis. 18-378 § 3(j) (2010).

Despite this flexibility, the D.C. Circuit has held that, in the context of assessing federal diversity jurisdiction, the statutory requirement to be registered functions as a jurisdictional bar. *See Tel. & Data Sys.*, 966 F.2d at 699; *see also Landmark Health*, 950 F. Supp. 2d at 134; *Hunter Innovations Co. v. Travelers Indem. Co. of Conn.*, 605 F. Supp. 2d 170, 172 (D.D.C. 2009). Simply put, a plaintiff's "failure to register is not merely a matter of [its] capacity to sue, but instead, determines whether this Court has subject matter jurisdiction to hear its claims." *Landmark Health*, 950 F. Supp. 2d at 134–35. A Court's analysis must examine the state of affairs at the time the plaintiff brought the action, *see Grupo Dataflux v. Atlas Global Grp.*, 541 U.S. 567, 571 (2004), and "later events may not create jurisdiction where none existed at the time of filing," *Landmark Health*, 950 F. Supp. 2d at 135 (quoting *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1337 (Fed. Cir. 2008)).

Here, it is undisputed that ACC was doing business in the District pursuant to the subcontract at issue in this case and that ACC continued to perform work on other projects in the District through at least 2013. *See* Def.'s Mot. Dismiss, Ex. B at 1 (providing information on ACC's completed jobs as of December 31, 2013, including the state where each project was located); 1st Decl. of Irene Stephen ¶ 5, ECF No. 23-2 (acknowledging the list of projects, but stating that none were still being performed by ACC as of April 28, 2015). It is also undisputed that ACC did not register with the DCRA until after it brought this action. *See* Def.'s Mot. Dismiss, Ex. A, Pl.'s Resp. Def.'s First Admissions Requests ¶ 2 (admitting that ACC "is not registered as a foreign corporation with the District of Columbia Department of Consumer and Regulatory Affairs"); Certificate of Registration, ECF No. 23-1 (listing an effective date of August 20, 2016 for ACC's certification).

These facts, considered in light of this Court's decision in *Landmark Health*, suggest that the District's door closing statute prevents this Court from exercising subject matter jurisdiction. But ACC attempts to distinguish this case from *Landmark Health* by arguing that the door closing statute does not apply because ACC was no longer doing business in the District at the time it filed this action.  *See* Pl.'s Resp. Mot. Dismiss at 2.  ACC argues that "the operative and controlling date for determining subject matter jurisdiction is the date the action is filed."  Pl.'s Resp. Mot. Dismiss at 2.  In other words, ACC argues that the door closing statute does not apply to an entity that fails to register with the DCRA, as long as the entity ceases operations in the District before bringing suit.

The Court is not convinced by ACC's reading of the door closing statute.  To be sure, ACC is correct that, in general, a court looks to the date a complaint was filed to determine whether subject matter jurisdiction existed at that time.  *See Grupo Dataflux*, 541 U.S. at 571. As set forth above, courts have determined that the requisite registration must exist at the time the complaint is filed.  *See, e.g.*, *Tel. & Data Sys.*, 966 F.2d at 699; *Landmark Health*, 950 F. Supp. 2d at 134.  But, aside from a citation to *Landmark Health*, ACC presents no authority supporting the proposition that the door closing statute does not apply where a business previously did business in the District, but ceased before filing suit.  *See* Pl.'s Resp. Mot. Dismiss at 2.  In fact, this Court noted in *Landmark Health* that the plaintiff "did not have a certificate of registration *during the life of the contract*, nor when it filed this action."  950 F. Supp. 2d at 134 (emphasis added).

Crucially, accepting ACC's reading would undermine the purpose of the door closing statute.  For more than fifty years, this court has recognized "that the real purpose and the aim of such legislation was to bring such corporations under the supervision and the regulation of public

officials charged with such responsibility." *Hill-Lanham*, 163 F. Supp. at 476.  The District of Columbia Court of Appeals similarly stated that the door closing statute is intended to "force the corporations to pay whatever fees, taxes, or other financial obligations are owing to the body politic." *York*, 296 A.2d at 714.  That objective would be thwarted if a foreign entity could simply cease operations in the District, and then bring suit in the District's courts without regard to the door closing statute.

 For these reasons, the Court rejects ACC's reading of the District's door closing statute. Despite ACC's cessation of business operations in the District, ACC previously conducted business in the district, including the performance of the contract that is at issue in this case. Because the Court finds that ACC did business in the District and failed to register with the DCRA before bringing suit, the door closing statute applies and this Court lacks subject matter jurisdiction.  *See Tel. & Data Sys.*, 966 F.2d at 699; *Landmark Health*, 950 F. Supp. 2d at 134. Thus, the Court grants Fort Myer's motion to dismiss for lack of subject matter jurisdiction.

### b.  Supplemental Pleading

 The Court's conclusion that the door closing statute applies to this case does not fully resolve this issue.  ACC asserts that it registered with the DCRA during the pendency of this case and requests leave to file a supplemental complaint.  *See* Pl.'s Resp. Mot. Dismiss at 2.  This Court approved of that procedure in *Landmark Health*.[7]  *See* 950 F. Supp. 2d at 135–36.

---

[7] After the defendant in *Landmark Health* moved to dismiss the supplemental complaint, this Court reaffirmed its holding that the plaintiff could cure jurisdictional infirmities caused by the door closing statute by filing a supplemental complaint showing that the plaintiff had registered with the DCRA.  *See Landmark Health Sols., LLC v. Not for Profit Hosp. Corp.*, No. 11-0456, 2014 WL 685553, at *1 (D.D.C. Feb. 24, 2014) ("Landmark is now registered with the DCRA; it has paid its dues to the sovereign, as is the District's goal. It has filed a supplemental complaint that properly alleges this Court's jurisdiction. That is sufficient.").

As previously stated, failure to register with the DCRA is "a mere temporary disability and, therefore, capable of obviation at any [stage] of the proceedings." *York*, 296 A.2d at 714 (quoting *Hill-Lanham*, 163 F. Supp. at 476)).  Federal Rule of Civil Procedure 15(d) gives courts the authority "to permit a party to serve a supplemental pleading setting forth events which have happened since the date of the original complaint." *Landmark Health*, 950 F. Supp. 2d at 135 (quoting *Fund for Animals v. Hall*, 246 F.R.D. 53, 54 (D.D.C. 2007)); *see also* Fed. R. Civ. P. 15(d) ("On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented.").  Thus, ACC may attempt to cure the jurisdictional defect by filing a supplemental complaint pursuant to Rule 15(d) that properly alleges this Court's jurisdiction.  *See Prasco*, 537 F.3d at 1337 ("Supplemental pleadings can be used to cure subject matter jurisdiction deficiencies.").  Therefore, the Court will dismiss for lack of subject matter jurisdiction, but grant leave for ACC to file a supplemental complaint within thirty days. *See Landmark Health*, 950 F. Supp. 2d at 135 (granting leave to amend in thirty days); *cf.* 5B Charles Wright & Arthur Miller, *Federal Practice and Procedure* § 1350 (3d ed. 2017) ("When the pleader's affidavits or other evidence show either that the court actually has subject matter jurisdiction over the case or that the nonmoving party might be able to amend to allege jurisdiction, the district court may deny the motion and direct the pleader to amend the pleading or it may dismiss with leave to amend within a prescribed period of time.").

## B.  Summary Judgment

The Court next turns to the parties' motions for summary judgment.  Fort Myer argues that summary judgment should be granted in its favor because ACC agreed to a global release of all claims against Fort Myer.  *See* Def.'s Mem. Supp. Mot. Summ. J. at 3–6.  ACC argues that it

is entitled to partial summary judgment on two issues—first, that ACC is entitled to retainage purportedly withheld by Fort Myer, and second, that Fort Myer breached the subcontract by terminating for convenience. *See* Pl.'s Opp'n & Cross-Mot. Summ. J. at 7. Fort Myer moves to strike ACC's cross-motion, arguing that it was filed out of time and fails to comply with the Local Rules of this Court. *See* Def.'s Mot. Strike ¶¶ 3–4. For the reasons set forth below, the Court will deny summary judgment to both parties. Because the Court denies ACC's cross-motion for partial summary judgment on the merits, Fort Myer's motion to strike is denied as moot.

### 1. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The inquiry under Rule 56 is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

The principal purpose of summary judgment is to determine whether there is a genuine need for trial by disposing of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to

specific facts in the record that reveal a genuine issue that is suitable for trial. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The non-movant may not rest upon mere allegations or denials but must instead present affirmative evidence. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). All underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### 2. Fort Myer's Motion for Summary Judgment

Fort Myer's motion for summary judgment relies on the release executed between Fort Myer and ACC in November 2014. *See* Def.'s Mem. Supp. Mot. Summ. J. at 3. Fort Myer contends that the release was global in scope and that it unambiguously applied to *all* claims between Fort Myer and ACC, including claims related to the Anacostia Project, even though the release did not specifically mention the Anacostia Project. *See* Def.'s Mem. Supp. Mot. Summ. J. at 4. ACC argues that the parties did not intend for the release to apply to claims arising from the Anacostia Project. *See* Pl.'s Opp'n & Cross-Mot. Summ. J. at 4–6.

The release in question is a two-page document titled "Subcontractor's Affidavit and Final Waiver of Lien." Final Waiver of Lien at 1. The document, dated November 20, 2014, referred to the contract between Fort Myer and ACC for work on the Otis Street Project. Final Waiver of Lien at 1. The release did not specifically mention the Anacostia Project. *See generally* Final Waiver of Lien.

The release called for Fort Myer to pay ACC $10,000.  Final Waiver of Lien at 1.

In consideration for the payment, ACC promised to:

> Release and forever discharge Fort Myer of and from all debts, claims, demands, liabilities and causes of action of every character whatsoever arising out of or in connection with subcontract or any other work performed by subcontractor on any project except as follows: (there are no exceptions unless specific claims in stated amounts are listed):

Final Waiver of Lien at 2.  Following that paragraph, handwritten notes purportedly written by Edward Hollander, the late owner of ACC, list "AS-BUILTS PURCHASE ORDER $4,000 – (LESS APPROX $3,600 +/- OWED BY ACC ON ANOTHER PROJECT) FOR NET OF ABOUT $400 +/- (SEPARATE MATTER)."  Final Waiver of Lien at 2.

Fort Myer argues that the "language of the release is clear and unambiguous," and that the release is global in scope.  Def.'s Mem. Supp. Mot. Summ. J. at 4.  Fort Myer notes that the release states that it applies to "all debts, claims, demands, liabilities and cause of action of every character whatsoever arising out of or in connection with . . . any other work performed by subcontractor on any project."  Def.'s Mem. Supp. Mot. Summ. J. at 4 (quoting Final Waiver of Lien at 2).  Fort Myer also notes that the release included space for ACC to list any exceptions, and that ACC's representative did list claims related to certain projects, but not claims related to the Anacostia Project.[8]  *See* Def.'s Mem. Supp. Mot. Summ. J. at 4.

---

[8] Fort Myer also asserts that Fort Myer and ACC have executed numerous other lien releases from 2009 to 2012.  Def.'s Mem. Supp. Mot. Summ. J. at 5.  The other lien releases purportedly applied to "any other work performed by subcontractor on *said* project" instead of "any other work performed by subcontractor on *any* project."  Def.'s Mem. Supp. Mot. Summ. J. at 5.  Fort Myer states that it has produced these releases to ACC in discovery, but the Court will not consider them here because they have not been introduced into the record by either party.  However, the Court notes that, to the extent extrinsic evidence of "the course of dealing between the parties" can be admitted to understand what a reasonable person in the position of the parties understood the contract to mean, this deviation might cut against Fort Myer's argument.  *Abdelrhman v. Ackerman*, 76 A.3d 883, 889 (D.C. 2013) (quoting *Ozerol v. Howard Univ.*, 545 A.2d 638, 642 (D.C. 1988)).

Fort Myer's argument presents a question of contract interpretation.  Under District of Columbia law, "[a] release is a form of contract, and the rules of contract construction govern its interpretation."[9]  *GLM P'ship v. Hartford Cas. Ins. Co.*, 753 A.2d 995, 998 (D.C. 2000) (quoting *District of Columbia v. Wash. Hosp. Ctr.*, 722 A.2d 332, 342 (D.C. 1998)); *see also Noonan v. Williams*, 686 A.2d 237, 241 (D.C. 1996).  The interpretation of an unambiguous contract is a question of law, as is the determination whether the contract is ambiguous.  *See Abdelrhman v. Ackerman*, 76 A.3d 883, 887–89 (D.C. 2013).  A contract, "is not rendered ambiguous merely because the parties disagree over its proper interpretation."  *Parker v. U.S. Trust Co.*, 30 A.3d 147, 150 (D.C. 2011) (quoting *Gryce v. Lavine*, 675 A.2d 67, 69 (D.C. 1996)).  "[T]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking."  *Abdelrhman*, 76 A.3d at 888 (second alteration in original) (quoting *Dyer v. Bilaal*, 983 A.2d 349, 354–55 (D.C. 2009)).

Nevertheless, the District of Columbia Court of Appeals has acknowledged that its "cases have not been a model of clarity" when it comes to whether extrinsic evidence can guide a court's assessment of a contract's meaning.  *Id.*; *see also N.W. v. District of Columbia*, 107 F. Supp. 3d 141, 147–48 (D.D.C. 2015) ("The District of Columbia Court of Appeals has not definitely resolved the precise scope of this exception.").  The Court of Appeals has acknowledged a line of cases that allows extrinsic evidence to be considered, not for the

---

[9] Without specifically briefing the issue, the parties appear to implicitly agree that District of Columbia contract law governs this issue.  *See* Def.'s Mem. Supp. Mot. Summ. J. at 4; Pl.'s Opp'n & Cross-Mot. Summ. J. at 3.  Therefore, the Court will apply District of Columbia law. *See Beach TV Properties, Inc. v. Solomon*, No. 15-1823, 2016 WL 6068806, at *9 n.9 (D.D.C. Oct. 14, 2016); *cf. In re Korean Air Lines Disaster*, 932 F.2d 1475, 1495 (D.C. Cir. 1991) (Mikva, J., dissenting) ("Unlike jurisdictional issues, courts need not address choice of law questions *sua sponte*.").

purposes of establishing the parties' *subjective intent*, but for guiding a court's *objective* analysis of what a reasonable person would understand the contract to mean.  *See Abdelrhman*, 76 A.3d at 888–89.

In other words, the Court of Appeals has "recognized that 'confusion sometimes arises because of a failure to distinguish clearly between direct evidence as to what a particular party intended the language to mean, a subjective question, and evidence of the general situation, the relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties, all of which may be useful aids in determining whether objectively the meaning of the contract language is not susceptible of a clear and definite undertaking.'"  *Id.* at 889 (quoting *Ozerol*, 545 A.2d at 642).  The Court of Appeals has also held that "an evaluation of the surrounding circumstances is to be applied whether the contract's language appears ambiguous or not." *Patterson v. District of Columbia*, 795 A.2d 681, 683 (D.C. 2002), *amended on denial of reh'g by* 819 A.2d 320 (D.C. 2003); *see also Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C. 2009) ("Extrinsic evidence may be used to 'determine the circumstances surrounding the making of the contract,' however, it may not be relied upon to show the subjective intent of the parties absent ambiguity in the contract's language." (quoting *1010 Potomac Assocs. v. Grocery Mfrs. of America, Inc.*, 485 A.2d 199, 205–06 (D.C. 1984))); *Christacos v. Blackie's House of Beef, Inc.*, 583 A.2d 191, 194 (D.C. 1990) ("[E]xtrinsic evidence may be considered to determine the circumstances surrounding the making of the contract so that it may be ascertained what a reasonable person in the position of the parties would have thought the words meant." (quoting *1010 Potomac Assocs.*, 485 A.2d at 205–06)).

Fort Myer's argument fails to account for these sources of extrinsic evidence, which the Court can consider to determine whether a release is truly unambiguous on its face. Here, it is undisputed that the release did not specifically mention the Anacostia Project. *See* Final Waiver of Lien at 1–2. According to the declaration of Ms. Stephen, ACC believed Fort Myer owed $22,000 for the Otis Street Project, *see* 2d Decl. of Irene Stephen ¶ 4, and ACC ultimately accepted $10,000 in the release, *see* Final Waiver of Lien at 1. According to the declaration of Ms. Lawson, Fort Myer believed that ACC owed $4,348.10 for projects other than the Otis Street Project, and Fort Myer ultimately accepted $3,600 in the release.[10] *See* Decl. of Jennifer Lawson ¶¶ 7–8; *see also* Final Waiver of Lien at 2. The original value of the Anacostia Project subcontract was $649,161, and that figure increased to nearly $1 million following change orders.[11] *See* Def.'s Opp'n Cross-Mot. Partial Summ. J., Ex. B, attached Payment Estimate. This disparity is relevant to whether a reasonable person in the position of the parties would have understood the release to apply to the Anacostia Project. *See Abdelrhman*, 76 A.3d at 888.

Furthermore, counsel for the parties exchanged a series of letters regarding Fort Myer's decision to terminate the Anacostia Project subcontract with ACC. *See e.g.*, Pl.'s Opp'n & Cross-Mot. Summ. J., Ex. 2 at 2, 4–5; Def.'s Statement of Undisputed Facts, Ex. A at 1; Def.'s Opp'n Cross-Mot. Partial Summ. J., Ex. C at 1. During the course of those communications, a letter drafted by ACC's outside counsel stated that Mr. Hollander had been directed to communicate with Fort Myer's inside counsel. *See* Def.'s Statement of Undisputed Facts, Ex. A at 1. All subsequent communications in the record regarding the Anacostia Project were sent

---

[10] No declarations address the separate $4,000 payment that Fort Myer made to ACC for the "AS-BUILTS PURCHASE ORDER." Final Waiver of Lien at 2.

[11] In its Complaint, ACC alleges that the value of the subcontract following change orders was $1,052,878.17. Compl. ¶ 6

through counsel.  District of Columbia Rule of Professional Conduct 4.2 prohibits an attorney

from communicating "about the subject of the representation with a person known to be

represented by another lawyer in the matter, unless the lawyer has the prior consent of the lawyer

representing such other person or is authorized by law or a court order to do so."  D.C. RPC

4.2(a).  Rule 4.2 does not apply, however, to communications between the parties regarding a

separate matter.  *See* D.C. RPC 4.2, comt. 2.  There is no indication that ACC was represented by

counsel with regard to the Otis Street Project.  This extrinsic evidence is relevant to whether a

reasonable person would understand the release to apply to the Anacostia Project.[12]

Fort Myer presents a straightforward argument that the release's reference to "work

performed by subcontractor on any project" extends to claims related to the Anacostia Project.

Def.'s Mem. Supp. Mot. Summ. J. at 4 (quoting Final Waiver of Lien at 2).  But the release is

styled as a final waiver of lien related to the Otis Street Project, and extrinsic evidence, including

the disparate values at issue and counsel's previous involvement, shows that a reasonable person

would have reason to believe that the release did not extend to the Anacostia Project.  The Court

concludes that the release does not clearly and unambiguously apply to the Anacostia Project.

The District of Columbia Court of Appeals has made clear that, "'[b]ecause consideration of

such extrinsic evidence is for the fact finder,' once a contract is determined to be ambiguous,

summary judgment generally is improper."  *Aziken v. District of Columbia*, 70 A.3d 213, 219

(D.C. 2013) (quoting *District of Columbia v. D.C. Pub. Serv. Comm'n*, 963 A.2d 1144, 1156

(D.C. 2009)).  Therefore, the Court will deny Fort Myer's motion for summary judgment.

---

[12] ACC also urges the Court to consider purported instances where counsel for Fort Myer conceded that retainage is due to ACC.  *See* Pl.'s Opp'n & Cross-Mot. Summ. J. at 6.  For the reasons set forth more fully below, the Court finds that those communications are inadmissible, and the Court does not rely on them here.  *See infra* Part III.B.3.a.

### 3. ACC's Cross-Motion for Partial Summary Judgment

In its opposition to Fort Myer's motion for summary judgment, ACC includes a brief cross-motion for partial summary judgment. *See* Pl.'s Opp'n & Cross-Mot. Summ. J. at 7. ACC raises two issues in its cross-motion. First, ACC contends that it is entitled to retainage purportedly withheld by Fort Myer. Pl.'s Opp'n & Cross-Mot. Summ. J. at 7. Second, ACC argues that Fort Myer breached the subcontract through its termination for convenience. Pl.'s Opp'n & Cross-Mot. Summ. J. at 7. The Court will address the two issues in turn.[13]

#### a. Retainage

The entirety of ACC's argument regarding the retainage consists of two sentences. ACC argues: "The retainage is subcontract money, earned by ACC prior to the termination, which Fort Myer has conceded is due, but which has not been paid. The retainage is in the amount of $4,764.38. See affidavit of Irene Stephen and email correspondence attached." Pl.'s Opp'n & Cross-Mot. Summ. J. at 7.

Upon considering the supporting materials, the Court notes that Ms. Stephen's declaration simply states: "The amount of the retainage held by Fort Myer and due and owing on this project is $4,764.38." 2d Decl. of Irene Stephen ¶ 3. The email that ACC refers to is found in a communication between Michael J. Jack, counsel to ACC in this litigation, and Christopher

---

[13] Fort Myer moves to strike ACC's cross-motion. *See* Def.'s Mot. Strike. Fort Myer correctly notes that the Court issued an order requiring all dispositive motions to be filed on or before August 1, 2016. *See* Def.'s Mot. Strike ¶ 2 (citing Scheduling Min. Order (June 14, 2016)). That deadline reflected the exact briefing schedule proposed by the parties. *See* Parties' Meet and Confer Statement, ECF No. 19. Despite the Court's order, ACC filed its cross-motion for partial summary judgment on August 30, 2016. *See* Pl.'s Opp'n & Cross-Mot. Summ. J. Fort Myer also notes that ACC did not present a statement of material facts that it contends are not in dispute, as required by this Court's Local Rules. *See* Def.'s Mot. Strike ¶¶ 4–5 (citing LCvR 7(h)). The Court acknowledges Fort Myer's concerns. However, because the Court will deny ACC's cross-motion for partial summary judgment on the merits, Fort Myer's motion to strike is denied as moot.

A. Coppula, Counsel to Fort Myer.  *See* Pl.'s Opp'n & Cross-Mot. Summ. J., Ex. 3 at 1, ECF No.

24-3.  As a part of that exchange, counsel for ACC mentions that "[t]here is a small [amount] of

retainage owed.  I assume that is not in dispute."  Pl.'s Opp'n & Cross-Mot. Summ. J., Ex. 3 at 1.

In response, counsel for ACC writes, "The retainage is not in dispute."[14]  Pl.'s Opp'n & Cross-

Mot. Summ. J., Ex. 3 at 1.

 First, the Court notes that ACC cannot rely on the email exchange to establish that

summary judgment is appropriate.  This discussion between counsel relates to attempts to clarify

the value of the claims at issue and constitutes inadmissible compromise negotiations.  *See* Fed.

R. Evid. 408(a).  A party asserting that a fact cannot be genuinely disputed must support that

assertion with admissible evidence.  *See* Fed. R. Civ. P.  56(c)(2).  Thus, the Court will disregard

the email exchange for the purposes of evaluating ACC's cross-motion for partial summary

judgment on the issue of retainage.

 Second, the Court previously determined that there was a genuine issue of material fact

as to whether ACC waived all claims against Fort Myer, including the retainage, by executing

the release related to the Otis Street Project.  *See supra* Part III.B.2; *see also* Def.'s Opp'n Cross-

Mot. Partial Summ. J. at 2 n.2, ECF No. 28 (incorporating Fort Myer's argument "that ACC

waived its rights to all amounts due and owing by its execution of a full release").  That dispute

alone provides a sufficient basis for the Court to find that ACC has failed to carry its burden

here.  *See* Fed. R. Civ. P. 56(a).  At the very least, "the evidence presents a sufficient

---

 [14] The Court notes that a portion of the email exchange appears to be cut off in the exhibit filed with the Court.  The older of the two messages included in the exhibit appears to be cut off mid-sentence.  Pl.'s Opp'n & Cross-Mot. Summ. J., Ex. 3 at 1 (concluding last sentence of message without a period or any signature).  It also appears that the same message was responding to an earlier message that is not included in the exhibit.  Pl.'s Opp'n & Cross-Mot. Summ. J., Ex. 3 at 1 (beginning message "Chris – This is very helpful.  I will pass along to ACC." and listing subject line as "Re: ACC/FMCC").

disagreement to require submission to a jury," *Anderson*, 477 U.S. at 251–52, and the Court will therefore deny ACC's cross-motion for partial summary judgment on the issue of the retainage.

### b. Breach

The Court next turns to ACC's argument that Fort Myer breached the subcontract when it terminated for convenience. Pl.'s Opp'n & Cross-Mot. Summ. J. at 7. ACC contends that "[t]he subcontract permits termination for convenience only if Fort Myer's contract is terminated by the owner," meaning DDOT, and that "[i]t is undisputed that Fort Myer's contract was not terminated." Pl.'s Opp'n & Cross-Mot. Summ. J. at 7. ACC concludes that Fort Myer's decision to terminate the subcontract, to refuse to rescind the decision, and to permit another subcontractor to perform the work originally subcontracted to ACC all constitute a breach of the subcontract entitling ACC to recover damages. Pl.'s Opp'n & Cross-Mot. Summ. J. at 7.

Again, ACC presents scant support for its argument. Aside from one sentence stating that "[r]elevant portions of the subcontract are attached," ACC presents no direct citations to the record and no citations to legal authority. Pl.'s Opp'n & Cross-Mot. Summ. J. at 7. Federal Rule 56 makes clear that "[a] party asserting that a fact cannot be . . . genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). ACC's vague references to "[r]elevant portions of the subcontract" do not carry that burden. *Cf. Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988) (finding that the district court is not "obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material disputed fact"); *Robertson v. Am. Airlines, Inc.*, 239 F. Supp. 2d 5, 9 (D.D.C. 2002) (striking movant's statement of facts for "liberally mix[ing] facts with argument"

which "does nothing to assist the court in isolating the material facts, distinguishing disputed from undisputed facts, and identifying the pertinent parts of the record").

But even if ACC had presented a cognizable argument, the Court still finds that Fort Myer has presented evidence purporting to show that DDOT, in fact, constructively terminated the prime contract.  *See* Def.'s Opp'n Cross-Mot. Partial Summ. J. at 4–5.  For instance, Fort Myer presents evidence purporting to show that DDOT's amendment was so significant that it constituted a new contract.  *See* Def.'s Opp'n Cross-Mot. Partial Summ. J., Ex. E (setting forth extensive changes to the prime contract).  Taking the facts in the light most favorable to Fort Myer, ACC has failed to show that Fort Myer breached the subcontract when Fort Myer terminated the subcontract for convenience.  For the reasons set forth above, the Court will deny ACC's cross-motion for partial summary judgment on this issue.

## IV.  CONCLUSION

For the foregoing reasons, Fort Myer's Motion for Summary Judgment (ECF No. 20) is **DENIED**; Fort Myer's Motion to Dismiss (ECF No. 21) is **GRANTED** with leave for ACC to file a supplemental complaint within thirty days; ACC's Cross-Motion for Partial Summary Judgment (ECF No. 29) is **DENIED**; and Fort Myer's Motion to Strike (ECF No. 27) is **DENIED AS MOOT**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 29, 2017                                          RUDOLPH CONTRERAS
                                                               United States District Judge