UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| AMERICAN CIVIL CONSTRUCTION, LLC, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 15-515 (RC) |
| | : | | |
| v. | : | Re Document No.: | 38 |
| | : | | |
| FORT MYER CONSTRUCTION CORPORATION, | : | | |
| | : | | |
| Defendant. | : | | |

# MEMORANDUM OPINION

### DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff American Civil Construction, LLC ("ACC") has sued Defendant Fort Myer Construction Corporation ("Fort Myer") for breaching a subcontract relating to the construction of the District of Columbia's streetcar line in Anacostia. The subcontract at issue had stated that Fort Myer could only terminate the subcontract with ACC for convenience if the District had similarly terminated the prime contract for convenience. Fort Myer claims that the District terminated the prime contract for convenience, and that therefore, the company was within its rights to terminate its subcontract with ACC. As such, it moved for partial summary judgment on ACC's breach of contract claim. ACC opposed the motion, countering that the District had never terminated its contract with Fort Myer for convenience. For the reasons set forth below, the Court finds that Fort Myer has not met its burden of demonstrating that its contract with the District was terminated for convenience, and therefore denies its motion for partial summary judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In late 2008, the District of Columbia Department of Transportation ("DDOT") contracted with Fort Myer to construct a segment of a new streetcar line in Anacostia. Statement of Undisputed Facts Supp. Def.'s Mot. Partial Summ. J. ("Def.'s SUF") ¶ 1, ECF No. 38-2. While a copy of this contract has not been produced to the Court, Fort Myer claims that it "incorporated the Standard Contract Provisions For Use with Specifications for District of Columbia Government Construction Projects, a published set of provisions common to all DDOT construction contracts." *Id.* ¶ 2. These Standard Specifications govern how the scope of a project may be changed, how all or part of a project may be suspended or delayed, and how all or part of a project may be terminated at the convenience of the District. *Id.*

ACC subcontracted with Fort Myer to perform a portion of the work Fort Myer was contracted to do, and began work, along with Fort Myer, in 2009. *Id.* ¶ 3. The subcontract specified that Fort Myer could only terminate ACC for convenience if DDOT had similarly terminated Fort Myer for convenience. *See* Ex. A, Pl.'s Mem. Opp'n Def.'s Mot. Partial Summ. J. ("Pl.'s Opp'n"), ECF No. 39-2 at 54. By September 2010, both Fort Myer and ACC had completed and had been paid for a portion of the work, but still had additional work in their contracts to complete. Def.'s SUF ¶ 4. Then, on October 12, 2010, Fort Myer received an "Article 3 Letter" from DDOT explaining that "[t]he remaining scope of the work of this Contract is limited to the work identified in this Article 3 Letter, and the Contractor shall not perform any other work, unless it receives written authorization from the Contracting Officer." Ex. 5 at 1, Def.'s Mot. Partial Summ. J ("Def.'s Mot."), ECF No. 38-3. "Two attachments to the Article 3 Letter identified work that remained to be performed under a new scope of work: 'Attachment A' identified remaining work that was part of the original Contract" and

"'Attachment B' identified remaining work that had been added to the Contract by change orders after work had begun . . . . Together, these Attachments describe[d] all of the unterminated work that was to be completed under the Contract." Def.'s SUF ¶ 5. The Letter explained that "[a] change order [would] be processed for an equitable adjustment to the Contract Price for the prospective work" that was not included in the Attachments. Ex. 5 at 1, Def.'s Mot. The letter further stated that "DDOT reserve[d] the right to amend the scope of work to include additional work, or to modify previously authorized work." *Id.* at 2. There was no indication in the letter of why DDOT was deleting items from the contract.

After receiving the Article 3 Letter, on or about October 22, 2010, Fort Myer sent a letter confirming their "verbal notification to [AAC] of DDOT's desire to 'shut-down'" the project. Ex. 6 at 1, Def.'s Mot., ECF No. 38-3. It explained that there was a "possibility that the Owner [would] reaffirm its intent to delete the work indicated, and thus to wrap up this Contract in the near term." *Id.* The letter also asked ACC to submit a proposal for compensation for its costs resulting from "the early termination of work." *Id.* Subsequently, Fort Myer and ACC completed the work that remained in the Attachments in Spring 2011. Def.'s SUF ¶ 8.

Then, over a year later, on or about May 23, 2012, DDOT sent Fort Myer another letter ("the Completion Letter") revealing that DDOT had sent the Article 3 Letter because it had been unable to secure a particular permit from the Department of Consumer and Regulatory Affairs. Ex. 7 at 1, Def.'s Mot., ECF No. 38-3. Having resolved the permit issue, DDOT "intend[ed] to amend the Contract . . . to complete the" project. *Id*. The letter explained that DDOT was sending a new Scope of Work plan with the letter describing the remaining work for Fort Myer to complete. *Id*. The new Scope of Work plan "included some of the original tasks that Fort Myer had agreed to perform under the Contract, and in turn included tasks . . . that had been in ACC's

3

subcontract." Def.'s SUF ¶ 9. Fort Myer was directed to "verify that the current Contract Unit Price Schedule of Items (Bid Schedule)" was still "applicable." Ex. 7 at 1, Def.'s Mot. The letter further explained that "[a] change order [would] be processed for an adjustment of contract time, adding 800 calendar days for a revised contract completion date of February 15, 2013," which would "reflect an adjustment in Contract Price for the prospective work and cost." *Id.* at 2. "By accepting this change order, the contractor agree[d] that as of the date[] of change order execution, all claims due to the original contract [would be] resolved and there [would] be no additional claims by the contract[or] and its subcontractor." *Id.*

Fort Myer now claims that it treated this letter as an invitation to bid on the project. Def.'s SUF ¶ 12. It claims to have "evaluated its ability and the ability of its subcontractors to perform the work described in the Completion Letter, and it determined that it could complete the work beginning in the latter half of 2012." *Id.* However, it decided that it would not use ACC as a subcontractor on this portion of the project. *Id*. Fort Myer explains that it considers the work in ACC's subcontract that had not been completed before the issuance of the Article 3 Letter and was not listed in the Attachments to the Article 3 Letter to have been terminated for convenience by the DDOT, though it does not specify when it made its determination that the prime contract had been terminated for convenience. *Id.* ¶ 13. As such, in a letter dated October 26, 2012, Fort Myer informed ACC that despite the fact that DDOT had "recently directed Fort Myer Construction Corporation to resume work on the Project," Fort Myer was exercising its contractual right to terminate ACC's subcontract for convenience. *See* Ex. 8, Def.'s Mot., ECF No. 38-3. In this letter, Fort Myer referred to DDOT as having "suspended [the prime contract] and [having] deleted portions of its scope." *Id.*

4

ACC responded two weeks later that it did not believe that the Article 3 Letter had terminated Fort Myer's contract with the District for convenience, and therefore, that Fort Myer could not terminate its subcontract with ACC for convenience either. *See* Ex. A at 1, Def.'s Statement of Undisputed Facts, ECF No. 20. After the exchange of additional correspondence, ACC filed this action against Fort Myer claiming that Fort Myer had wrongfully terminated its subcontract because the subcontract had specified that Fort Myer could only terminate it if DDOT had similarly terminated the prime contract, which it had not done. *See* Compl., ECF No. 1.[1] To remedy the alleged wrongful termination of the contract, ACC seeks "overhead or profit on the work not performed due to the termination." *Id.* ¶ 13.

Following discovery, Fort Myer moved to dismiss the case for lack of jurisdiction, and also moved for summary judgment; in response, ACC moved for partial summary judgment. Only ACC's motion for partial summary judgment asked the Court to adjudicate the question of whether Fort Myer had breached its subcontract with ACC when it terminated it for convenience. *See generally Am. Civ. Constr., LLC v. Fort Myer Constr. Corp*, 246 F. Supp. 3d 309 (D.D.C. 2017). The Court found that ACC had not presented sufficient evidence to prove that Fort Myer's contract with DDOT had not been terminated for convenience to meet its burden on summary judgment. *Am. Civ. Constr.*, 246 F. Supp. 3d at 325. The Court also found that "Fort Myer ha[d] presented evidence purporting to show that DDOT, in fact, constructively terminated the prime contract," raising questions of fact that prevented the Court from granting partial summary judgment to ACC. *Id.* Fort Myer subsequently moved for partial summary judgment,

---

[1] ACC also seeks damages for the cost of performance and profit on work that it performed but for which Fort Myer has not paid, and for retainage being improperly held by Fort Myer. *See* Supp. Compl. ¶¶ 14–17. Fort Myer has not moved for summary judgment on these claims. *See* Mem. P. & A. Supp. Def.'s Mot. Partial Summ. J. ("Def.'s Mem.") at 2–3, ECF No. 38-4.

asking this Court to find that it "had the right to terminate ACC's subcontract for convenience" without paying ACC for lost overhead and profits. Def.'s Mem. at 2–3. Its motion is now ripe for decision.

### III. LEGAL STANDARD

Fed. R. Civ. P. 56 provides that a court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are those capable of affecting the substantive outcome of the litigation, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute regarding those facts is "genuine" if there is enough evidence on the record for a reasonable jury to find for the non-movant, *Scott v. Harris*, 550 U.S. 372, 380 (2007).

On summary judgment, the movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The purported dispute may not be based on mere allegations—rather, the non-movant must present affirmative evidence demonstrating that there is indeed a genuine dispute. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). However, all underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Liberty Lobby*, 477 U.S. at 255.

## IV. ANALYSIS

Adjudication of this motion will hinge on whether the Court can determine that DDOT terminated its contract with Fort Myer for convenience. If such a termination did not occur, then Fort Myer's attempt to terminate its subcontract with ACC for convenience violated the applicable provisions of the subcontract. *See* Ex. A, Pl.'s Opp'n, ECF No. 39-2 at 54. Fort Myer claims that "DDOT's 2010 letter stopping all work was a partial or total termination for convenience of all of the work that ACC was to perform," and that therefore, Fort Myer "had the right to terminate ACC's subcontract for convenience." Def.'s Mem. at 2. It further claims that even if the contract had not been actually terminated for convenience, at the very least it was constructively terminated for convenience. *See* Def.'s Mot. at 1, ECF No. 38.

ACC responds that the prime contract had not in fact been terminated for convenience, and therefore, Fort Myer could not terminate ACC's subcontract for convenience. Moreover, ACC argues that, even if Fort Myer had appropriately terminated the subcontract for convenience, ACC would still be entitled to recover its expected overhead and profits on unperformed work under the terms of its subcontract. *See* Pl.'s Opp'n at 2–4. For the reasons set forth below, Fort Myer has not met its burden of demonstrating that its prime contract with DDOT had been terminated for convenience, thereby allowing it to terminate ACC's subcontract for convenience. Because the Court cannot yet determine whether the prime contract had been terminated for convenience, the Court need not directly address the question of whether ACC would still be entitled to expected overhead and profits on unexecuted work even if the prime contract, and then the subcontract, had been appropriately terminated for convenience.[2]

---

[2] The Court does note, however, that this argument appears to have merit. The relevant clauses of the subcontract are found in the original subcontract document, an addendum to it, and a modification to both the subcontract and the addendum. Section 7.2.4 of the original

7

### A. Applicable Law

The parties once again appear to implicitly agree that District of Columbia contract law governs the interpretation of these contracts. *See* Def.'s Mem. at 4–5; Pl.'s Opp'n (not challenging Fort Myer's reliance on District of Columbia contract law); *see also Am. Civ. Constr.*, 246 F. Supp. 3d at 321 n.9 ("Without specifically briefing the issue, the parties appear to implicitly agree that District of Columbia contract law governs this issue."). Therefore, the Court will again apply District of Columbia law to questions of contract law in this case. *See Beach TV Props., Inc. v. Solomon*, No. 15-1823, 2016 WL 6068806, at *9 n.9 (D.D.C. Oct. 14, 2016); *cf. In re Korean Air Lines Disaster*, 932 F.2d 1475, 1495 (D.C. Cir. 1991) (Mikva, J., dissenting) ("Unlike jurisdictional issues, courts need not address choice of law questions *sua sponte*.").

However, District of Columbia "case law on termination for convenience claims is not well developed." *TRG Constr., Inc. v. D.C. Water & Sewer Auth.*, 70 A.3d 1164, 1167 (D.C.

---

subcontract provides that in the event of a termination for convenience, "the Subcontractor shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed." Ex. A, Pl.'s Opp'n, ECF No. 39-2 at 9. Section 7.3 of the original subcontract deals with suspensions for convenience. The addendum to the original subcontract document includes a Section 7.2.4 that does not address the termination for convenience process, and a Section 7.3, which provides that when the Subcontractor is terminated for convenience, "the Subcontractor shall be entitled to receive the value of the portion of the subcontract it has completed, but shall not be entitled to payment for overhead and/or profit on uncompleted work." *Id.* at 24. The addendum also explains that its terms "modify and take precedence over terms contained in the [subcontract]," but that "[r]eferences to articles or paragraphs are for convenience only and shall not be limiting in any fashion." *Id.* at 23. However, in the modification of the subcontract and the addendum to the subcontract, Section 7.3 of the addendum is stricken, deleted, and replaced with instructions that "[t]he Contractor can only terminate the Subcontractor for convenience if the Owner similarly terminates the Contractor." *Id.* at 54. The modification leaves Section 7.2.4 of the original subcontract intact. As such, the final subcontract appears to include Section 7.2.4 of the original subcontract (providing for recovery of reasonable overhead and profit on unexecuted work after a termination for convenience), but not Section 7.3 of the addendum (explicitly prohibiting recovery for overhead and profits on uncompleted work), which would have overridden Section 7.2.4 of the original subcontract if it had not been stricken and deleted by the modification to the addendum.

2013). But "[w]ith few exceptions, District contracting practice parallels federal government contract law." *District of Columbia v. Org. for Envtl. Growth, Inc.*, 700 A.2d 185, 198 (D.C. 1997). This is especially so when District of Columbia termination for convenience language "closely resembles the termination for convenience language in the federal acquisition regulations," 48 C.F.R. § 52.249-2(g)(2), (k), allowing "decisions of the federal courts on termination for convenience" to be "persuasive authority on related issues." *TRG Constr., Inc.*, 70 A.3d at 1167. As such, the Court will also rely on federal contract law concerning terminations for convenience in order to adjudicate this motion.

### B. Actual Termination for Convenience

Fort Myer claims that its prime contract with DDOT was "actual[ly]" terminated for convenience, paving the way for it to lawfully terminate its subcontract with ACC. Def.'s Mot. at 1. Its arguments center around inferences it draws from the two letters DDOT sent it regarding the prime contract. To support this contention, Fort Myer first argues that, because DDOT "permitted Fort Myer to replace subcontractors before work on the project resumed," and Fort Myer's subcontract only permitted termination if the prime contract had also been terminated, DDOT was "signaling that the original contract had been partially terminated." Def.'s Mem. at 9. Second, it argues that because the Article 3 Letter "contained an express order" to delete work "that made no mention of suspension or delay of the work," it must have been a termination for convenience, rather than a suspension. Def.'s Mem. at 6. ACC counters that the prime contract was never in fact terminated for convenience, and therefore that Fort Myer's termination of the subcontract was unlawful. Pl.'s Opp'n at 4. In order for Fort Myer to succeed on summary judgment with the argument that the prime contract had been terminated for convenience, it must show that no issue of material fact remains as to whether DDOT terminated the contract for

9

convenience. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). As explained below, Fort Myer has failed to make this showing.

Termination for convenience clauses are "intended to enable the [government's] contracting officer to stop or curtail a contractor's performance without involving the government in a breach that would render it liable for the contractor's anticipatory profits." *Torncello v. United States*, 681 F.2d 756, 759 (Ct. Cl. 1982). "Ideally, a contracting officer terminating a contract for the convenience of the government would specify the circumstance that gave rise to the termination in the notification sent to the contractor." *Praecomm, Inc. v. United* States, 78 Fed. Cl. 5, 11 (2007).

Fort Myer claims that its prime contract with DDOT provided for such terminations for convenience. Article 6 of the District's Standard Contract Provisions (titled "Termination for Convenience of the District"), which Fort Myer claims was incorporated into its contract with DDOT, provides that "[t]he performance of work under the Contract may be terminated by the District in accordance with this Article in whole, or in part, whenever the Contracting Officer shall determine that such termination is in the best interest of the District." *See* Ex. 3 at 15, Def.'s Mot., ECF No. 38-3. The provision continues that "[a]ny such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the Contract is terminated, and the date upon which such termination becomes effective." *Id.* Separately, Article 3 of the same document (titled "Changes") provides that "[t]he Contracting Officer may, at any time, . . . by written order designated or indicated to be a change order, make any change in the work within the general scope of the Contract . . . . If any change under this Article causes an increase or decrease in the Contract's cost of . . . performance of

any part of the work under this Contract . . . an equitable adjustment shall be made and the Contract modified in writing accordingly." Ex. 3 at 11, Def.'s Mot.

The District did indeed send Fort Myer a letter limiting the "remaining scope of work on this Contract" to "the work identified in this Article 3 Letter." Ex. 5 at 1. Of course, Article 3 is the provision concerning change orders, not terminations for convenience. Contrary to the requirements contained within Article 6, the provision pertaining to terminations for convenience, the letter did not explicitly indicate that it was a Notice of Termination, did not include the date upon which the termination would become effective, and did not indicate that the district was terminating the contract because such termination was in the best interest of the District. Rather, it referred to itself as an Article 3 Letter (referring to Article 3 of the Standard Specifications for Highways and Structures,[3] which contains the same language as Article 3 of the Standard Contract Provisions), and explained that it preceded a change order "for an equitable adjustment to the Contract Price for the prospective work." *Id.* Such change orders for equitable adjustments are provided for in both Articles 3 and 6 of the Standard Specifications for Highways and Structures. *See* Ex. 3 at 11, 18, Def.'s Mot.

As a preliminary matter, Fort Myer has failed to produce a copy of the actual contract governing DDOT's ability to terminate the contract for convenience, preventing the Court from directly analyzing the terms and procedures under which this termination may occur. *Cf.* Pl.'s Opp'n at 5 ("The District may have had the right to terminate the prime contract for convenience, although the prime contract is not attached to Fort Myer's motion and is not in the record now before this Court . . . ."). Instead of producing a copy of the contract, Fort Myer

---

[3] D.C. Dep't of Transp., Standard Specifications for Highways and Structures (2009), https://ddot.dc.gov/sites/default/files/dc/sites/ddot/publication/attachments/publication_standard_specifications_2009.pdf

11

submitted a copy of the District of Columbia's Standard Contract Provisions. *See* Ex. 3, Def.'s Mot. These provisions may very well govern the contract between DDOT and Fort Myer. However, the Court has scant evidence of that. Instead, it only has a sentence in Fort Myer's Statement of Undisputed Facts, which is not evidence, explaining that "[t]he Contract incorporated the Standard Contract Provisions For Use With Specifications for District of Columbia Government Construction Projects, a published set of provisions common to all DDOT construction contracts," Def.'s SUF ¶ 2, as well as a form soliciting a bid to contract for the project, which specified that "[t]he District requires performance of the work described in strict accordance with . . . The Standard Contract Provisions." Ex. 2, Def.'s Mot., ECF No. 38-3. It does not, however, include a copy of the actual contract DDOT and Fort Myer signed, indicating that the Standard Contract Provisions had actually been incorporated into the contract, nor does it include an affidavit attesting to the fact that these exact provisions were included in the executed contract.[4] Therefore, on the most basic level, this Court cannot determine whether the actions of DDOT in October 2010 complied with the contractual provision governing the District's ability to terminate for convenience.

Even assuming that Fort Myer had presented sufficient evidence that Article 6 of the Standard Contract Provisions was included in its contract with DDOT, it is not clear from the record that the District intended to terminate the contract for convenience, despite Fort Myer's arguments to the contrary. Fort Myer argues that the Contracting Officer's letter restarting the work of the contract indicates that the Article 3 Letter had been, in reality, a termination for

---

[4] And in the Article 3 Letter, DDOT indicated that it was Article 3 of the Standard Specifications for Highways and Structures, and not of the Standard Contract Provisions, that governed the prime contract.

12

convenience.[5] Def.'s Mem. at 9. According to Fort Myer, the Completion Letter DDOT sent in May 2012 "did not presume that Fort Myer and its initial subcontractors would necessarily be able to perform the tasks in the new Scope of Work that were part of the original Contract at the same price." *Id.* "Instead, it directed Fort Myer to verify the Contract Unit Price Schedule attached to it and to submit changes to those prices if they were no longer applicable." *Id.* at 9–10 (citing Ex. 7 at 1, Def.'s Mot.). It is true that the Completion Letter directed Fort Myer to verify the original Contract Unit Price Schedule and inform DDOT if the unit prices were still applicable. However, nowhere in this letter did DDOT indicate that it believed that Fort Myer had free range to substitute one subcontractor for another. Indeed, the Letter did not even indicate that DDOT believed that Fort Myer could decline to perform the work requested. The Letter referred to DDOT's intention to "amend the Contract" and included several definitive "wills" and "shalls." *See* Ex. 7, Def.'s Mot.

Overall, the Completion Letter did not clearly indicate that DDOT believed that it had already fully or partially terminated the prime contract for convenience in 2010. Rather, despite Fort Myer's arguments to the contrary, it appears that DDOT believed that its Article 3 Letter had merely "delayed" the contract, even though the Article 3 Letter never indicated that the work deleted from the contract might be resumed at a later date. Although Fort Myer is correct that the Article 3 Letter did not use the words "suspend," "delay," or "interrupt," nor did it invoke Article 26, the Standard Contract Provision governing the suspension of work, *see* Def.'s Mem. at 6–7, the Article 3 Letter also failed to mention Article 6 or the phrase "termination." Instead it mentioned Article 3, which governs changes to the contract. Overall, Fort Myer simply has not

---

[5] Although Fort Myer's arguments concern the District's intent in issuing the Article 3 Letter and the subsequent Completion Letter, neither party provides any testimony from any District employee indicating the District's intent when it sent those letters.

produced any evidence or case law that indicates that DDOT clearly terminated its contract with Fort Myer for convenience. Therefore, the Court cannot grant Fort Myer summary judgment on this ground.

### C. Constructive Termination for Convenience

Fort Myer also claims that its prime contract with DDOT was "constructive[ly]" terminated for convenience, paving the way for it to lawfully terminate its subcontract with ACC. Def.'s Mot. at 1. In support of this contention, it argues that "[t]he Article 3 Letter must be interpreted as a termination for convenience of the District because it eliminated identifiable items of work and reduced the quantity of work" that remained on the contract. Def.'s Mem. at 7. It argues that because deductive change orders and terminations for convenience contain common elements, the "Court is not required to accept the Contracting Officer's characterization of the termination of the work as a 'Change' under Article 3." *Id*. Fort Myer is therefore arguing, in effect, that even if the Court finds that the contract had not been explicitly terminated for convenience, it should find that the contract was constructively terminated for convenience. ACC does not directly address the argument of constructive termination, instead pointing to various facts that demonstrate that the contract was never in fact terminated. However, despite the lack of robust rebuttal from ACC, Fort Myer still fails to demonstrate that the Court should find that DDOT constructively terminated the prime contract for convenience.

"Constructive resort to [a termination for convenience] clause . . . occurs in situations in which the government has stopped or curtailed a contractor's performance for reasons that turn out to be questionable or invalid" in order to "avoid breach and limit liability." *Torncello*, 681 F.2d at 759; *see also Scott Timber Co. v. United States*, 64 Fed. Cl. 130, 142 (2005) ("Constructive termination is applied when the Government attempts to terminate a contract, but

14

fails to do so for a legally sufficient reason. If, at the time, the Government had a right to terminate, the Court will hold that the contract was constructively terminated—even if the Government was unaware of that right.") "[It] is a judge-made doctrine," *Maxima Corp. v. United States*, 847 F.2d 1549, 1553 (Fed. Cir. 1988), that "enables the government's actual breach of contract to be retroactively justified." *Id.* at 1552–53 (citing *G.C. Casebolt Co. v. United States*, 421 F.2d 710, 712 (Ct. Cl. 1970)). Overall, constructive termination is a mechanism that courts can utilize to shield the government from liability for breach of contract in certain circumstances.

Fort Myer points to no examples of courts invoking the doctrine of constructive termination for convenience in order to protect a non-governmental contracting party from liability to a subcontractor, and as far as the Court can tell, there are none. That is because constructive termination for convenience is a vehicle through which courts protect the government from a claim of breach when the government acted in a way that would have been permissible if it had invoked the correct provision of its contract. When the government faces no such accusation for breach, invocation of the doctrine is unnecessary.[6] Because Fort Myer has not alleged that DDOT breached the prime contract when it sent its Article 3 Letter to Fort Myer, and indeed, it does not appear that DDOT did breach the prime contract by sending the Letter, the Court denies Fort Myer partial summary judgment on this ground as well.

---

[6] Fort Myer cites to three cases in support of the proposition that the Court should find that DDOT terminated the prime contract for convenience because it "eliminated identifiable items of work and reduced the quantity of work" on the contract. Def.'s Mem. at 7–9. However, each of these cases is easily distinguishable from the instant case, and none supports the proposition that a court may invoke constructive termination for convenience when the government is not as risk of liability for breach.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment (ECF No. 38) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 20, 2018                                                                RUDOLPH CONTRERAS
                                                                                                          United States District Judge